SNML CORPORATION, D/B/A SNML, INC. v. BANK OF NORTH CAROLINA, N.A., GOLDEN EAGLE OF RALEIGH, INC., C. D. SPANGLER CONSTRUCTION COMPANY, C. D. SPANGLER, SR., AND C. D. SPANGLER, JR.

No. 7810SC675

(Filed 1 May 1979)

1. **Principal and Surety § 1— surety defined**

  A surety is one who becomes responsible for the debt, default or miscarriage of another; but in a narrower sense, a surety is a person who binds himself for the payment of a sum of money, or for the performance of something else, for another who is already bound for such payment or performance.

SNML Corp. v. Bank

**2. Guaranty § 1— guaranty defined**

A guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of the default of another person who is liable for such payment or performance in the first instance.

**3. Guaranty § 1; Principal and Surety § 1— guaranty and surety distinguished**

Guaranty is distinguishable from suretyship in that the former is a collateral and independent undertaking creating a secondary liability, while the latter is a direct and original undertaking under which the obligor is primarily and jointly liable with the principal.

**4. Principal and Agent § 1— agent defined**

An agent is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other, and to render an account of it.

**5. Guaranty § 1; Principal and Agent § 10— bank holding stock as security for lessee's performance—agent of lessor—fiduciary duty**

Under an "Escrow Agreement" by which defendant bank held stock certificates as security for defendant lessee's performance of a lease and was not to release the stock until it determined that all covenants contained in the lease had been met, including the lessee's agreement to pay ad valorem taxes on the leased premises, defendant bank was not a guarantor or surety of the lessee's performance but was an agent of plaintiff lessor and owed a fiduciary duty to the lessor; therefore, a consent judgment which released the lessee from liability for ad valorem taxes did not relieve defendant bank of its responsibility under the "Escrow Agreement," and the bank is liable to plaintiff lessor for damages caused by its release of the stock to its owners when ad valorem taxes for 1973 and 1974 had not been paid on the leased premises.

**6. Principal and Agent § 10— agent's breach of fiduciary duty—release of collateral—damages—value of collateral**

Where defendant's breach of its fiduciary duty to plaintiff lessor consisted of wrongfully releasing stock held as collateral security for a lessee's breach of its obligations under the lease, the value of that collateral was necessary to a determination of plaintiff lessor's damages.

APPEAL by defendant, Bank of North Carolina, N.A., from *Smith (Donald L.), Judge.* Judgment entered 12 May 1978 in Superior Court, WAKE County. Heard in the Court of Appeals 5 April 1979.

A chronological summary of the complicated factual situation disclosed by the record best postures this civil action on appeal:

1. On 20 January 1966 defendant, Golden Eagle of Raleigh, Inc. (GOLDEN EAGLE), as lessee, acquired from Frances W.

Crowder and Frank M. Williams, as lessors, a 75-year leasehold estate (GROUND LEASE) in certain real property located in the city of Raleigh, Wake County, North Carolina (SUBJECT PREMISES).

2. On 23 August 1966, GOLDEN EAGLE entered into a sublease agreement for the SUBJECT PREMISES to Sir Walter Inn, Inc. (SIR WALTER).

The lease agreement (GOLDEN EAGLE / SIR WALTER LEASE) provided for SIR WALTER to lease from GOLDEN EAGLE the SUBJECT PREMISES for a term of 20 years for an annual rental of $125,400. Other pertinent portions of the GOLDEN EAGLE / SIR WALTER LEASE called for GOLDEN EAGLE to construct a 114-unit motel on the SUBJECT PREMISES complete with certain furnishings and equipment. Certain interior furnishings were to be provided by SIR WALTER. As tenant, SIR WALTER was to operate a motel and restaurant facility on the SUBJECT PREMISES. The lease agreement dealt with other matters such as repairs, utilities, taxes, insurance, payments, destruction of improvements, condemnation, default; abandonment, subordination, security interest, quiet enjoyment, successors and assigns, investment credit, assignment and subletting, notices, and curing of default.

3. On 27 December 1966 GOLDEN EAGLE conveyed to First National Bank of Eastern North Carolina Employees' Profit Sharing and Pension Trust (PROFIT SHARING PENSION TRUST) certain of its assets, including its leasehold estate in the SUBJECT PREMISES under the GROUND LEASE subject to the GOLDEN EAGLE / SIR WALTER LEASE.

4. On 1 July 1967, by assignment of lease, GOLDEN EAGLE became the successor in interest of SIR WALTER INN, INC. under the GOLDEN EAGLE / SIR WALTER LEASE.

5. On 14 November 1967 the defendants C. D. Spangler Construction Company, C. D. Spangler, Sr., and C. D. Spangler, Jr. (SPANGLERS) entered into an agreement with PROFIT SHARING PENSION TRUST.

The pertinent parts of the SPANGLER / PROFIT SHARING PENSION TRUST agreement provided as follows: That the PROFIT SHARING PENSION TRUST did not have sufficient as-

sets to borrow a sufficient amount of cash in order to fully pay cash for the GOLDEN EAGLE assets and therefore SPANGLERS agreed to lend, set over and assign 8,193 shares of common stock of First National Bank of Eastern North Carolina "as a loan and as collateral security for the purpose of pledging and borrowing against"; that SPANGLERS had in fact pledged the 8,193 shares of stock as additional security to the faithful performance of the obligations assumed by SIR WALTER INN; that the SPANGLERS now desire to amend and broaden the original stock pledge agreement and do so by extending the guarantees of faithful performance of all the covenants and agreements in the GOLDEN EAGLE / SIR WALTER LEASE for a period of three years beyond the guarantee contained in that agreement, that is, the said guarantee to begin on 1 January 1967 and end on 31 December 1974.

The pertinent provision of the agreement provided as follows:

2. As soon as practical after January 1, 1968, and as soon as practical on each January 1 of each subsequent year thereafter, the PLAN AND PENSION TRUST shall to its complete satisfaction determine that all covenants and agreements as contained in that certain lease agreement dated August 23, 1966, by and between Golden Eagle of Raleigh, Inc. and Sir Walter Inn, Inc., have been fully performed. If and when this has been done the PLAN AND PENSION TRUST shall release and deliver to the OWNER, [SPANGLERS] (each year) ONE THOUSAND (1,000) shares of the originally pledged EIGHT THOUSAND ONE HUNDRED AND NINETY-THREE (8,193) shares of common stock of First National Bank of Eastern North Carolina.

Pursuant to this agreement, SPANGLERS delivered the shares of common stock to PROFIT SHARING PENSION TRUST.

6. On 29 December 1967, PROFIT SHARING PENSION TRUST assigned to Samuel Leder the GOLDEN EAGLE / SIR WALTER LEASE and the GROUND LEASE.

7. In December 1968, Samuel Leder assigned *to* SNML the GOLDEN EAGLE / SIR WALTER LEASE and the GROUND LEASE. (SNML is a North Carolina corporation and the plaintiff in this action.)

8. At this point in time, GOLDEN EAGLE has acquired the status of tenant of plaintiff.

9. On 16 October 1977 PROFIT SHARING PENSION TRUST and First National Bank of Eastern North Carolina entered into an agreement which provided in pertinent part as follows:

> NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) and in further consideration of the mutual promises, said parties do hereby agree that the FIRST NA-TIONAL BANK OF EASTERN NORTH CAROLINA TRUST DEPARTMENT shall accept and hold *10,386* number of shares of Financial Corporation subject to the terms of an agreement by and between C. D. Spangler, Sr., C. D. Spangler, Jr., and C. D. Spangler Construction Co., Inc., all for the benefit of SNML Corporation in place of the PLAN AND PENSION TRUST and the ESCROW AGENT shall follow all of the terms of the agreement as originally set forth.

10. The defendant, BANK, and its Trust Department is the successor in interest of First National Bank of Eastern North Carolina and its Trust Department.

11. The 10,386 shares of Financial Corporation owned by SPANGLERS and then in the custody of First National Bank of Eastern North Carolina, upon execution and delivery of the agreement referred to above, were thereupon "deemed and held subject to the conditions of that agreement."

12. The ad valorem taxes on the SUBJECT PREMISES in the amount of $13,344.76 for the year 1973 were not paid by GOLDEN EAGLE.

13. The ad valorem taxes on the SUBJECT PREMISES in the amount of $13,712.39 for the year 1974 were not paid by GOLDEN EAGLE.

14. The ad valorem taxes on the SUBJECT PREMISES for the year 1975 were not paid in the prorated amount of $8,204.88 by GOLDEN EAGLE.

15. The total amount of ad valorem taxes on SUBJECT PREMISES for the years 1973, 1974, and prorated amount for the year 1975, with interest and penalties in the total amount of $39,476.28 were paid by the plaintiff, SNML, in August 1975.

16. Of the 10,386 shares of Financial Corporation held by Trust Department of BANK, 2,000 shares were released to the owners (SPANGLERS) in January, 1971, and 2,000 shares were released to the owners in January, 1972, and the remaining 6,386 shares were returned to the owners in January, 1975.

17. SNML and GOLDEN EAGLE, among others, were parties respondent in a special proceeding in the General Court of Justice, Superior Court Division, Wake County, North Carolina, entitled "CITY OF RALEIGH, Petitioner vs. FRANCES W. CROWDER, CAROLYN C. BARBOUR and Husband, DE VAN BARBOUR, HELEN C. GLASCOCK and Husband, SPENCER GLASCOCK, SARA C. SPURLIN and Husband, WILLIAM SPURLIN, MACON C. MOORE and Husband, G. S. MOORE, JR., FRANCES C. JONES and Husband, EDWIN JONES, SNML CORP., d/b/a SNML, INC., GOLDEN EAGLE OF RALEIGH, INC., CAROLINA POWER & LIGHT COMPANY, SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY, C. M. ALLRED, Trustee, NORTH CAROLINA NATIONAL BANK, B. A. JONES, Trustee, and FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF RALEIGH, Respondents," No. 74SP135, instituted on or about 31 October 1974, by the City of Raleigh for the acquisition by it, under its power of eminent domain, of fee simple title to the real property therein identified.

18. The real property affected by and identified in said special proceeding is the SUBJECT PREMISES herein.

19. A consent judgment, dated 12 August 1975, executed on behalf of SNML and GOLDEN EAGLE and the other respondents therein named was entered and filed in said special proceeding on 12 August 1975, which consent judgment is in full force and effect.

20. Pursuant to the provisions of the consent judgment the sums of money therein directed to be paid to and for the account of SNML, GOLDEN EAGLE, and others therein named were each duly and timely paid in full.

21. The pertinent provision of the consent judgment provides as follows:

4. That upon the disbursement of funds as provided in the foregoing subparagraphs (a), (b), (c), (d) and (e) *the interest of all respondent parties, through these disbursements, in and to the property involved in this proceeding shall be terminated and any lease agreement between these parties shall be terminated; and any and all obligations and liability of any party hereto for the payment to or for the account of any party to any such lease agreement of any rent, taxes, or other claims for or with respect to the subject property shall be terminated, released and discharged.* (Emphasis added.)

22. On 19 December 1975 plaintiff instituted this action seeking to recover, *inter alia*, the amount paid by it to the City of Raleigh for ad valorem taxes for the years 1973, 1974, and the prorated amount for the year 1975. Each defendant alleged in its answer that it had been released from liability to plaintiff by plaintiff's execution of the consent judgment referred to above and by the consent judgment itself.

The parties stipulated to the facts hereinabove set forth and the trial court heard the matter on the pleadings and stipulations. It made findings of fact and conclusions of law as follows: That the 16 October 1970 "Escrow Agreement" established a fiduciary relationship between the plaintiff and the defendant BANK and the BANK became the ESCROW AGENT of the plaintiff and not a guarantor or surety; that as ESCROW AGENT the BANK was obligated to perform certain tasks and among those was the ascertainment of whether the defendant GOLDEN EAGLE had fully performed all of its covenants and agreements as contained in the 23 August 1966 lease; that the defendant BANK held the stock certificates as security for performance of the lease and was not to release the stock unless all covenants and agreements contained in the lease had been met; that defendant GOLDEN EAGLE did not meet the covenants and agreements of the lease as it did not pay its ad valorem taxes for the years 1973 and 1974;

that defendant BANK released the collateral in January 1975 while ad valorem taxes for the years 1973 and 1974 were still outstanding thereby violating its agreement with plaintiff; that plaintiff paid the ad valorem taxes in question; that the consent judgment released defendant GOLDEN EAGLE from any liability to plaintiff; that the total amount paid for 1973 and 1974 was $27,057.15 and plaintiff was damaged in that amount and should recover that amount from the defendant BANK; that the action against all other defendants be dismissed. From the foregoing judgment, the defendant BANK appealed.

*Sheldon L. Fogel, for plaintiff appellee.*

*Poyner, Geraghty, Hartsfield & Townsend, by John J. Geraghty and Cecil W. Harrison, Jr., for defendant appellant Bank of North Carolina, N.A.*

CARLTON, Judge.

The first question for determination is whether appellant BANK properly released the shares of common stock of the BANK held as "collateral security" in January 1975 while ad valorem taxes for the years 1973 and 1974 were still outstanding. The trial court held that the BANK'S release of the stock was improper in that the "Escrow Agreement" of 16 October 1970 between the PROFIT SHARING PENSION TRUST and the BANK'S Trust Department established a fiduciary relationship between the plaintiff and appellant BANK and appellant BANK therefore became ESCROW AGENT for the plaintiff corporation and not a guarantor or surety. The trial court found that the 14 November 1967 agreement was incorporated into the ESCROW AGREEMENT and obligated the appellant to ascertain whether defendant GOLDEN EAGLE had fully performed all its covenants and agreements in the 23 August 1966 lease agreement, including the payment of ad valorem taxes and that the appellant should not have released the collateral security in January 1975 while ad valorem taxes for the years 1973 and 1974 were still outstanding.

Appellant BANK contends that the true relationships of the parties were that SPANGLERS, by reason of their pledge of stock, were to serve as sureties for the performance of GOLDEN EAGLE, the principal obligor, with the PROFIT SHARING PENSION TRUST, and subsequently the plaintiff, occupying the sta-

tus of beneficiary of the pledge. Therefore, appellant argues, the release by the consent judgment of the primary obligor, GOLDEN EAGLE, also operated to discharge the appellant BANK of its duty to retain the collateral security. Put another way, appellant argues that when a creditor gives the principal debtor an unconditional release of liability, the underlying obligation has been satisfied, and the guarantor of that obligation is no longer liable on the guaranty. The crucial question, therefore, is whether the true role of appellant BANK was that of a surety/guarantor or that of an agent/fiduciary. We agree with the trial court's ruling.

[1] A surety is one who becomes responsible for the debt, default or miscarriage of another; but in a narrower sense, a surety is a person who binds himself for the payment of a sum of money, or for the performance of something else, for another who is already bound for such payment or performance. 72 C.J.S., Principal and Surety, § 2, p. 515. *See also Casualty Co. v. Waller*, 233 N.C. 536, 64 S.E. 2d 826 (1951).

[2, 3] A guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of the default of another person who is liable for such payment or performance in the first instance. Although the contracts of guaranty and suretyship are to some extent analogous, and the terms are sometimes used interchangeably, there are nevertheless important distinctions between the two undertakings which are recognized in almost all jurisdictions. Guaranty is distinguishable from suretyship in that the former is a collateral and independent undertaking creating a secondary liability, while the latter is a direct and original undertaking under which the obligor is primarily and jointly liable with the principal. 38 C.J.S., Guaranty, §§ 1, 6, pp. 1129, 1136; *see also Investment Properties v. Norburn*, 281 N.C. 191, 188 S.E. 2d 342 (1972).

[4] An agent is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other, and to render an account of it. He is a substitute, or deputy, appointed by his principal primarily to bring about business relations between the latter and third persons. 2A, C.J.S., Agency, § 4, p. 554.

[5]   Clearly, the role of the appellant BANK was not that of guarantor or surety. Appellant was not an endorser of any instrument in the transaction. The ESCROW AGREEMENT referred to appellant BANK as the "Escrow Agent." Appellant was charged with determining if the provisions of the 23 August 1966 lease were complied with. It did not undertake to act as a surety or guarantor in any sense in the event the lessee failed to perform. Appellant simply agreed not to release any security it held unless the lessee performed its agreement under the lease agreement. From the facts before us, we must conclude that the true role of the appellant BANK was that of an agent.

An agent is a fiduciary concerning the matters within the scope of his agency. The very relation implies that the principal has placed trust or confidence in the agent, and the agent or employee is bound to the exercise of the utmost good faith, loyalty, and honesty toward his principal or employer. The fiduciary relationship existing between an agent and his principal has been compared to that which arises upon the creation of a trust. The rule requiring an agent to act with the utmost good faith and loyalty toward his principal or employer applies whether the agency is one coupled with an interest, the compensation given the agent is small or nominal, or it is a gratuitous agency. "Furthermore, it has been held that the duty of an agent to be faithful to his principal does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation; it is as sacred and inviolable after as before the expiration of the agency." 3 Am. Jur. 2d, Agency, § 199 *et seq.*, p. 580, and cases cited therein.

We interpret the various instruments to cast the appellant BANK in the role of an agent charged with the responsibility of determining that all the provisions of the 23 August 1966 lease were annually complied with. Among those provisions was the requirement that annual property taxes be paid. The agency relationship was to terminate on 31 December 1974. The record clearly disclosed that ad valorem taxes were not paid on the property in 1973 and 1974, prior to expiration of the agreement and that appellant BANK released the collateral security to SPANGLERS with the taxes unpaid. Indeed, appellant BANK admits that the taxes were unpaid and that the stock was delivered back to the SPANGLERS. In so doing, they violated the responsibility cast

upon them as agents. The consent judgment, in which appellant BANK was in no way a part, did not relieve appellant BANK of its responsibility under the agreement.

For the reasons stated, this assignment of error is overruled.

[6]   We next turn to appellant's contention that the trial court erred in awarding an amount of damages for which there was no evidence to support.

The trial court ordered that the plaintiff recover of appellant the sum of $27,057.15, the precise amount of ad valorem taxes for the years 1973 and 1974 which plaintiff was required to pay after all other parties failed to pay. The trial court was undoubtedly following the general rule that plaintiff was entitled to damages, in an action of this nature, which naturally and proximately are caused by the breach of defendant's duty to plaintiff.

However, it is also the rule in this jurisdiction that damages are never presumed and the burden is always upon the complaining party to establish by evidence such facts as will furnish a basis for their assessment, according to some definite and legal rule, and when compensatory damages are susceptible of proof with approximate accuracy, they must be so proved. 5 Strong, N.C. Index 3d, Damages, § 15, p. 44.

> [W]here actual pecuniary damages are sought, there must be evidence of their existence and extent, and some data from which they may be computed. No substantial recovery may be based on mere guesswork or inference; without evidence of facts, circumstances, and data justifying an inference that the damages awarded are just and reasonable compensation for the injury suffered. *Norwood v. Carter*, 242 N.C. 152, 156, 87 S.E. 2d 2, 5 (1955).

In the instant case, the court did not have before it sufficient data from which to compute damages to the plaintiff. It is true that the court had evidence, by way of stipulation, of the amount of ad valorem taxes which were paid by the plaintiff. However, the court did not have evidence by way of stipulation or otherwise, of the value of the collateral security released by appellant. Without such evidence, there was no way to accurately determine how much the release of the collateral harmed the plaintiff. Since defendant's breach consisted of wrongfully releasing the collateral

security, the value of that collateral was necessary to determine plaintiff's damage. Obviously, plaintiff may not be entitled to the full amount of taxes paid if the value of the released collateral would have been insufficient to pay those taxes.

This assignment of error is sustained. This part of the judgment must be vacated and remanded for further proceedings consistent with this portion of our opinion. On remand, the superior court will only give further consideration to the amount of plaintiff's damages. Plaintiff should not again be put to trial on the question of entitlement. *Lieb v. Mayer*, 244 N.C. 613, 94 S.E. 2d 658 (1956).

For the reasons stated, the judgment of the lower court is

Affirmed in part, vacated in part and remanded.

Judges PARKER and HEDRICK concur.